UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ZABRINA BROWN, o/b/o D.B.,

                Plaintiff,            Case No. 12-12627
                                            Honorable Bernard A. Friedman
                                            Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 14]**

      Plaintiff Zabrina Brown ("Plaintiff") brings this action on behalf of her minor daughter, D.B., pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying D.B.'s application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 14], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

      For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that D.B. is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Plaintiff's Motion for Summary Judgment [10] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

**II.    REPORT**

   **A.    Procedural History**

On June 27, 2008, an application for SSI was filed on behalf of D.B., alleging a disability onset date of August 10, 2006. (Tr. 106-11). This application was denied initially on August 28, 2008. (Tr. 68-71). A timely request for an administrative hearing was filed on D.B.'s behalf, and a hearing was held on April 15, 2010, before ALJ Paul Armstrong. (Tr. 1-29). D.B., who was represented by attorney Armin Fischer, testified at the hearing, as did Plaintiff and medical expert ("ME") Lawrence Hagerman. (*Id.*). On June 2, 2010, the ALJ issued a written decision finding that D.B. is not disabled. (Tr. 46-63). On May 14, 2012, the Appeals Council denied review. (Tr. 30-32). On behalf of D.B., Plaintiff filed for judicial review of the final decision on June 15, 2012 [1].

   **B.    Background**

   *1.    Disability Reports*

In a June 30, 2008 disability report, Plaintiff indicated that D.B. was then in the fifth grade at Key Elementary School in Oak Park, Michigan, and had not yet been tested for learning disabilities. (Tr. 130). Plaintiff indicated that D.B. first became disabled on August 10, 2006, and described D.B.'s disabilities as follows:

> She cannot pay attention in school, she is hyper active and when having to complete a task she feels very overwhelmed and begins to cry. She often has outburst [sic] for no reason at all, she has difficulty sleeping at night, and also getting up in the morning. ADHD, asthma.

(Tr. 126).

Plaintiff indicated that D.B. had treated with several medical providers regarding her asthma and Attention-Deficit Hyperactivity Disorder ("ADHD"). (Tr. 127-28). At the time of the report, D.B. was taking albuterol (for asthma) and Concerta (for ADHD). (Tr. 128). No side

effects were reported, although D.B. had just begun taking Concerta. (*Id.*).

When asked to describe D.B.'s daily activities, Plaintiff indicated that she rode her bike, got along well with friends and siblings, took the trash out, cleaned her room, and cared for her personal needs. (Tr. 133-34). Plaintiff also indicated that, on a daily basis, D.B. prepared foods such as sandwiches, wrote letters, read, and performed household chores such as dusting and sweeping. (Tr. 135-36). Before she began taking medication for her ADHD, however, D.B. "space[d] out" frequently and would not listen or focus at home or at school. (Tr. 133).

In a disability appeals report dated September 23, 2008, Plaintiff reported that D.B. had been taking a new ADHD medication (Focalin, instead of Concerta) since August 26, 2008. (Tr. 149). She also had begun treating with Dr. David Benjamin, a neurologist, at the Detroit Institute for Children. (Tr. 150). Plaintiff indicated her belief that, in addition to ADHD, D.B. had "a learning disability," but said that this had not yet been addressed. (Tr. 152).

### 2. *The April 15, 2010 Hearing Before the ALJ*

#### a. *D.B.'s Testimony*

At the April 15, 2010 hearing before the ALJ, D.B. testified that she was in the sixth grade and was taking "regular classes" (as opposed to special education classes). (Tr. 9). She acknowledged, however, that she received "extra help" and accommodations in order to continue in these classes. (*Id.*). When asked what grades she got in school, D.B. indicated that she was getting an A in technology, an A- in science (up from a C), a C in honors social studies, a D in language arts, and a B in math. (Tr. 10-11).

D.B. acknowledged having problems at home, saying that she often forgot she had homework and simply headed outside to play. (Tr. 12). She testified that her new ADHD medication was helping her to concentrate, and she was not as easily distracted at home and in

school as she previously had been. (Tr. 11). D.B. testified that she had friends at school and in her neighborhood and got along well with her teachers. (Tr. 9, 11-12).

### b. Plaintiff's Testimony

Plaintiff also testified at the hearing before the ALJ, indicating that, from the beginning of the 2009-2010 school year through March of 2010, D.B. was "getting bad grades" because her new school had mistakenly failed to provide her with accommodations previously deemed necessary under Section 504 of the Rehabilitation Act. (Tr. 13). Once D.B. began receiving the extra help mandated by her Section 504 plan, her grades improved. (Tr. 13).

Plaintiff testified that D.B. "gets mad quickly" and "tends to hit things or throw things" when she is angry. (Tr. 13). She is not very organized and simply walks away from her homework if she is frustrated. (Tr. 14). Plaintiff acknowledged that testing completed in March of 2010 indicated that D.B. (a sixth grader at the time) was functioning at a second grade level, saying that D.B. "struggles" with school. (Tr. 14-15). Apparently, D.B.'s school wanted to "hold her back" in prior years, but Plaintiff resisted that suggestion. (Tr. 15).

### c. Medical Expert's Testimony

Dr. Lawrence Hagerman, board certified in pediatrics, testified as a medical expert. (Tr. 17-28, 97). Upon questioning by the ALJ, Dr. Hagerman testified that D.B.'s ADHD does not meet or medically equal Listing 112.11. (Tr. 19-20). However, Dr. Hagerman further testified that D.B.'s impairment functionally equaled Listing 112.11 because she had "marked" limitations in "acquiring and using information" and "attending and completing tasks." (Tr. 20). Specifically, Dr. Hagerman stated that ". . . if she's more than two grades behind I think that's a marked impairment." (Tr. 23). Pressed by the ALJ, the medical expert testified as follows:

> If her grades are as good as her mother testified and as good as the child testified that's a very good sign and I wouldn't consider that as being a big

4

> problem at all. I'd probably say that she would have a less than marked. But my only statement earlier was that if she is indeed getting special education or special curriculum and she is being taught differently from the other students and she's three grades behind then we've got a significant.

(Tr. 25). Dr. Hagerman was then provided with a document evidencing D.B.'s performance – apparently with accommodations – on a standardized test in March of 2010. (Tr. 184-94). Upon reviewing this document, Dr. Hagerman opined, ". . . as far as my assessment of a child who's tested with an advanced test who has accommodations in order to take the test and still tested out only at a third grade level that's a marked impairment for you and in my opinion. That's my opinion. . . . And I think that she does have marked impairments in domain one and domain two." (Tr. 28). With respect to the other domains, Dr. Hagerman testified that D.B. had a "less than marked" limitation in caring for herself, and no limitation in the remaining three domains. (Tr. 22).

      3.     Medical Evidence

          a.     Treating Physicians

On June 11, 2008, during an intake session with Dale Ross, a social worker at Eastwood Clinic, Plaintiff and D.B. reported that D.B. had increasing problems with attending to school work and keeping her room in order. (Tr. 265). During the mental status examination, Mr. Ross noted that D.B. was quiet and polite but had trouble with the intake questions. (*Id.*). She was oriented to person, place, and time, but often appeared confused or uncertain. (*Id.*). Mr. Ross further noted that she was well-groomed, appeared comfortable and approachable, had a calm mood, had adequate long-term memory with prompts, appeared to be within the normal range of intelligence, and had good judgment but little insight. (*Id.*). Based on Mr. Ross' examination, Bela Shah, M.D. diagnosed D.B. with adjustment reaction and attention deficit disorders (inattentive type), and recommended weekly treatment sessions in order to increase D.B.'s

5

attentiveness at school and at home. (Tr. 267). There are no other records reflecting D.B.'s treatment at Eastwood Clinic.

Dr. David Benjamin, a pediatric neurologist at the Detroit Institute for Children, first saw D.B. on June 25, 2008. (Tr. 256-59). After a review of D.B.'s history, as well as a report from her school, Dr. Benjamin diagnosed D.B. with ADHD and started her on Concerta. (Tr. 259). At her next visit, on August 26, 2008, Dr. Benjamin switched D.B.'s medication to Focalin, because there was some concern that the effectiveness of Concerta was diminishing over time. (Tr. 253). Dr. Benjamin also noted that it was "likely that [D.B.] has some variety of a learning disability" and suggested that she be tested at school. (Tr. 255). At a visit on October 27, 2008, D.B. reported that the Focalin was helping, but another dose was added in the late afternoon because it appeared that the medication was wearing off. (Tr. 260-62).

On January 28, 2009, D.B. again saw Dr. Benjamin, and he noted that she was doing well "academically, behaviorally and socially at school." (Tr. 278). Because of side effects (loss of appetite), however, Dr. Benjamin discontinued the Focalin and re-started the Concerta. (Tr. 278-80). He also added Catapres for "sleep difficulties." (*Id.*). In April of 2009, D.B. reported having chest pains, and all ADHD medications were stopped pending the results of an electrocardiogram (EKG). (Tr. 283). When the EKG revealed a borderline prolonged QT interval, Dr. Benjamin decided in August of 2009 that stimulant medications would not be prescribed. (Tr. 284-86). He referred D.B. to the Children's Center for counseling to address her behavioral problems. (Tr. 286). At D.B.'s next visit, on October 26, 2009, her mother reported that, since going off the ADHD medication, D.B. was "explosive, argumentative, has temper tantrums and does not complete her schoolwork." (Tr. 288). Counseling was again recommended to address D.B.'s behavioral problems. (*Id.*). The record does not indicate

whether D.B. ever participated in counseling, as recommended by Dr. Benjamin.

On April 9, 2010, after treating D.B. for almost two years, Dr. Benjamin completed a "Medical and Functional Capacity Assessment (Child)." (Tr. 327-31). In that assessment, Dr. Benjamin opined that D.B. had marked limitations in "acquiring and using information" and "attending and completing tasks." (Tr. 329). He further opined that D.B. had no limitations in interacting and relating with others and moving about and manipulating objects, and moderate limitations in caring for herself and health and physical well-being. (Tr. 330-31).

### b. Consultative Sources

On August 20, 2008, D.B. underwent a consultative examination by Dr. Samuel Goldstein. (Tr. 234-40). After administering several psychological and intelligence tests, Dr. Goldstein concluded that D.B. was "functioning within the borderline range (Full Scale IQ Score 76)." (Tr. 236). Test results indicated that D.B., who was entering the fifth grade, was reading at 3.4 grade level, spelling at 2.8 grade level, and performing math at 2.9 grade level. (*Id.*). These scores ranged from the 10th to the 23rd percentile, which evidently was higher than anticipated based on D.B.'s IQ scores. (*Id.*). Dr. Goldstein's primary diagnosis was "borderline intellectual functioning," with attendant academic limitations, and he further indicated a belief that D.B. had "significant issues of an emotional nature involving anxiety and depression" that needed to be "more thoroughly elucidated." (*Id.*). Dr. Goldstein's prognosis was that D.B. "will probably need significant academic support, special education or related services." (Tr. 239).[1]

### 4. School Records and Evaluations

In April of 2008, D.B. was evaluated by Judith Gamily, a school social worker. (Tr. 137-

---

[1] Additionally, on August 14, 2008, a Childhood Disability Evaluation form was completed, on which state agency medical consultants concluded that D.B. had "less than marked" limitations in "acquiring and using information" and "attending and completing tasks." (Tr. 243).

7

38). Using information provided by Plaintiff, reports from D.B.'s teacher, and classroom observations, Ms. Gamily concluded that D.B. "displays developmental[ly] inappropriate levels of inattentiveness and concentration that strongly suggest the presence of Attention Deficit/Hyperactivity Disorder Inattention Subtype." (Tr. 138). Ms. Gamily noted that Plaintiff reported that D.B.'s second and third grade teachers both recommended retention due to poor academic skills. (Tr. 137). During the twenty minutes that Ms. Gamily observed D.B. in the classroom, D.B. was off-task 60% of the time. (*Id.*).

On September 29, 2008, at the request of Plaintiff, D.B. was evaluated by Jacquelyn Tobey, a school psychologist, in order to determine D.B.'s eligibility for special education services. (Tr. 247-51). The psychologist noted that D.B. had an average of 18 absences and 31 tardies per year. (Tr. 248). During a classroom observation, however, D.B. was on task 91% of the time. (Tr. 250). It was determined that D.B. did not have a specific learning disability, as defined by Michigan law, but her cognitive ability was in the "Below Average" range. (Tr. 250-51). D.B. was "recommended to receive accommodations under Section 504 of the Rehabilitation Act." (Tr. 251).

On March 15, 2010, D.B. was administered a set of tests from the Brigance Diagnostic Comprehensive Inventory Skills-Revised. (Tr. 184). D.B., who was in sixth grade at the time, performed at the 2nd grade level in math computation, math problem solving, and reading comprehension. (*Id.*). It was noted by the school counselor that this test was administered with D.B.'s Section 504 accommodations, which included "extended time on assignments; chunking assignments; shortened tests and quizzes; selective seating; cooperative learning; and consistent revisiting of organizational skills." (*Id.*).

A "teacher questionnaire" was completed in April of 2010 by D.B.'s school counselor,

Jacklyn Georgiou. (Tr. 195-202). Based on her observations, Ms. Georgiou opined that D.B. had problems with acquiring and using information; specifically, D.B. had a "serious problem" reading and comprehending written material and providing organized oral explanations and adequate descriptions, and she had a "very serious problem" with "applying problem-solving skills in class discussions." (Tr. 196). In the domain of attending and completing tasks, Ms. Georgiou opined that D.B. had a "serious problem" with completing work accurately without careless mistakes" and an "obvious problem" in several other areas. (Tr. 197). Ms. Georgiou stressed that her assessment of D.B.'s limitations in these areas was made despite the fact that strategies from D.B.'s Section 504 plan were being used daily to support D.B.'s learning. (*Id.*).

### C. Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. §416.924(a).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder"

9

whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Commissioner of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment does not "meet" a listed impairment, the impairment may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §416.926a. "Medical equivalency is covered by 20 C.F.R. §416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Commissioner of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Commissioner of Soc. Sec.*, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. §416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Evans ex rel. DCB v. Commissioner of Soc. Sec.*, 2012 WL 3112415, at *6 (E.D. Mich. Mar. 21, 2012) (quoting *Koepp v. Astrue*, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011)); *see also*

20 C.F.R. §416.926. "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability. If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Evans*, 2012 WL 3112415, at *7 (quoting *Emeonye v. Astrue*, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008)).

Regarding functional equivalence, there are six "domains" that an ALJ considers: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. §416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations" in two of the six. *See* 20 C.F.R. §416.926a(d). An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. §416.926a(e)(3)(i). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. §416.926a(e)(2)(i).

### D. The ALJ's Findings

At step one, the ALJ found that D.B. has not engaged in substantial gainful activity since June 27, 2008, the application date. (Tr. 49). At step two, the ALJ found that D.B. has the following severe impairments: ADHD, adjustment reaction disorder, borderline intellectual functioning, and asthma. (*Id.*). At step three, the ALJ concluded that these impairments do not

11

meet or medically equal any Listing. (*Id.*). The ALJ also found that D.B.'s impairments do not functionally equal any listing because she has "less than marked" limitations in the domains of "acquiring and using information" and "attending and completing tasks," and no limitations in the remaining four domains. (Tr. 49-63).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

As set forth above, both D.B.'s treating physician, Dr. Benjamin, and the medical expert, Dr. Hagerman, opined that she had marked limitations in the domains of "acquiring and using information" and "attending and completing tasks." In her motion, Plaintiff argues that the ALJ erred in rejecting these opinions and concluding that D.B.'s limitations in these domains were less than marked.[2] Plaintiff's arguments are without merit.

*1.     Dr. Benjamin's Opinion*

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakely v.*

---

[2] Plaintiff does not challenge the ALJ's conclusion that D.B. had no limitations in the remaining four domains.

*Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Id.* (citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion).  Treating source opinions are entitled to controlling weight only where they are well-supported and consistent with the record as a whole;  it is "error to give an opinion controlling weight simply because it is the opinion of a treating source."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Commissioner of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").

In this case, the ALJ rejected Dr. Benjamin's opinion that D.B. had marked limitations in the domains of "acquiring and using information" and "attending and completing tasks" for two reasons.  (Tr. 55-56).  First, the ALJ found that "Dr. Benjamin's own notes do not support his opinion of the claimant's limitations."  (Tr. 55).  Second, the ALJ noted that Dr. Benjamin's opinion was "unsupported by other evidence of record."  (*Id.*).

In rejecting Dr. Benjamin's opinion because it was not supported by his own treatment notes, the ALJ specifically referenced the fact that, overall, D.B. had normal clinical visits to Dr. Benjamin.  (Tr. 55).  This conclusion is borne out by the record evidence.  (*See, e.g.,* Tr. 254, 258, 261-62, 279-80, 282-83, 285-86, 288-89).  And, as the ALJ observed, despite the fact that Plaintiff complained that D.B. was hyperactive and inattentive, Dr. Benjamin noted at multiple

14

visits that D.B. was alert, oriented, cooperative, and had an attention span and speech pattern normal for children her age. (Tr. 55, 254, 258, 262, 279, 282, 286, 289). Moreover, in January of 2009, Dr. Benjamin noted that D.B. was doing well academically, behaviorally, and socially at school. (Tr. 278).

Plaintiff challenges the ALJ's analysis of Dr. Benjamin's opinion by referring to D.B.'s symptoms ("difficulty completing school work at school and at home," poor ability to focus, "easy distractibility"), but these are *symptoms reported by D.B.'s mother*, not objective medical findings.[3] Courts have recognized that where a doctor's opinion is based largely on the claimant's subjective complaints, as opposed to objective medical evidence, it should not be given controlling weight. *See Mitchell v. Commissioner of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009) ("A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule."); *Ansley v. Commissioner of Soc. Sec.*, 2009 WL 6058944, at *8 (W.D. Mich. Sept. 2, 2009) (internal citations omitted); *Williams v. Astrue*, 2010 WL 503140, at *8 (E.D. Tenn. Feb. 8, 2010) (an opinion based largely on the claimant's self-reporting is entitled to minimal weight). It was reasonable, then, for the ALJ to conclude that Dr. Benjamin's largely normal clinical findings were inconsistent with his opinion that D.B. had marked limitations in "acquiring and using information" and "attending and completing tasks."

---

[3] Plaintiff disputes this proposition in her reply brief, arguing that Dr. Benjamin's "opinion is based upon 'teacher's report' and 'result of psychological evaluation at school' and this information shows 'distractibility' 'difficulty completing school work at school and at home' and 'poor ability to focus. Easy distractibility.'" (Doc. #15 at 5). Plaintiff conflates these portions of Dr. Benjamin's opinion, however. Although Dr. Benjamin does identify teacher reports and a school psychological evaluation as "clinical findings and objective signs supporting the diagnoses" (Tr. 327), the symptoms he lists (poor ability to focus, distractibility, etc.) are not contained in this report or this evaluation (Tr. 138, 208); rather, they are symptoms reported by Plaintiff, as the ALJ found.

15

The ALJ also rejected Dr. Benjamin's opinion as "unsupported by other evidence of record." (Tr. 55). As an example, the ALJ cited Dr. Goldstein's August 2008 report, which noted that contrary to Plaintiff's report that D.B. was hyperactive, D.B. "did not manifest abnormal psychomotor activity during testing." (*Id.* (citing Tr. 239)). The ALJ also pointed out Dr. Goldstein's notation that D.B.'s IQ scores demonstrated that she was functioning at a somewhat higher level than expected. (Tr. 51 (citing Tr. 239)). Plaintiff argues that Dr. Goldstein's report "does not contradict Dr. Benjamin's opinion" because "Dr. Goldstein did not assess [D.B.] in the 6 domains." (Doc. #10 at 17). This is beside the point. Regardless of whether Dr. Goldstein opined as to D.B.'s functioning in each of the six domains, his own objective findings were at odds with Dr. Benjamin's opinion that D.B. was markedly limited in "acquiring and using information" and "attending and completing tasks." Thus, the ALJ's decision to reject Dr. Benjamin's opinion as to D.B.'s limitations in these two domains is supported by substantial evidence.

2. *Dr. Hagerman's Opinion*

As set forth above, Dr. Hagerman, the ME, also testified that D.B. had "marked" limitations in "acquiring and using information" and "attending and completing tasks." (Tr. 20). Dr. Hagerman based his opinion, in large part, on D.B.'s performance on a standardized test in March of 2010.[4] (Tr. 184-94). Essentially, Dr. Hagerman concluded that D.B. had marked limitations in these two domains because she performed more than two grade levels below her actual grade level on this test. (Tr. 28). The ALJ rejected Dr. Hagerman's opinion because it was "based on his review of the hearing testimony and the evidence, including Dr. Benjamin's

---

[4] Plaintiff asserts that the ALJ "misquoted the evidence when he stated this test was given without accommodation . . . ." (Doc. #15 at 7). This is not true. The ALJ clearly stated that, in considering D.B.'s results on this test, he "inferred that the claimant underwent [] testing *with the 504 Plan accommodations* . . . ." (Tr. 54) (emphasis added).

16

notes" and because he did not examine D.B. (Tr. 56).

Plaintiff argues that the ALJ erred in rejecting Dr. Hagerman's opinion because he did not examine D.B. (Doc. #10 at 17-18). The applicable regulations provide, however, that, generally speaking, more weight will be given to an examining source than to a non-examining source. *See* 20 C.F.R. §404.1527(c)(1). Thus, this was an appropriate factor for the ALJ to consider.

Plaintiff cites Social Security Ruling 96-6p in support of her argument that the ALJ "violated procedure when he rejected Dr. Hagerman for not examining the Plaintiff." (Doc. #15 at 8). However, the exact language relied on by Plaintiff actually buttresses the ALJ's analysis: it provides that the ALJ "may not ignore" the opinions of medical experts and "must explain the weight given to the opinions in their decisions." (*Id.* at 8 (quoting Soc. Sec. Rul, 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). Here, the ALJ did not ignore Dr. Hagerman's opinion; rather, he discussed this opinion and explained why he was rejecting Dr. Hagerman's conclusions regarding D.B.'s limitations in the first two domains. (Tr. 56-59). For example, the ALJ cited D.B.'s history of academic improvement with ADHD medication, the fact that she was on task 91% of the time during a classroom observation in 2008, the fact that her absences and tardies were higher than the national average, and the fact that she achieved reasonably good grades in regular sixth grade classes as evidence contradicting Dr. Hagerman's opinion. (Tr. 57-58). Because Dr. Hagerman was not a treating source, the ALJ was not required to give "good reasons" for rejecting his opinion. *See Norris v. Commissioner of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("an ALJ need only explain its reasons for rejecting a treating source because such an opinion carries 'controlling weight' under the SSA"); *Smith v. Commissioner of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("the SSA requires ALJs to give reasons for only *treating*

sources") (emphasis in original). In this case, where the ALJ considered Dr. Hagerman's opinion and explained why he was rejecting portions of it, he did not commit error.

> 3. *Substantial Evidence Supports the ALJ's Conclusion that D.B. Does Not Have Marked Limitations in "Acquiring and Using Information" and "Attending and Completing Tasks"*

Plaintiff faults the ALJ because he "fails to cite evidence of any doctor" who agrees that D.B. has less than marked limitations in the domains of "acquiring and using information" and "attending and completing tasks." (Doc. #15 at 5). Plaintiff does not, however, cite any law for the proposition that the only evidence relevant to such a determination comes from medical sources. Indeed, Social Security Ruling 09-3p recognizes that, particularly with respect to school-aged children like D.B., "school records are often a significant source of information about limitations" in the domains of "acquiring and using information" and "attending and completing tasks." Soc. Sec. Rul. 09-3p, 2009 WL 396025, at *3 (Feb. 17, 2009). The ALJ's decision cites numerous facts, which, taken together, provide ample support for his conclusion that D.B. does not have marked limitations in these two domains. For example, the ALJ noted that D.B. has never been diagnosed with a learning disability; has had poor attendance, which could have contributed to her difficulties at school; was in "regular" (not special education) classes; recently obtained grades that included an A (in technology), an A- (in science, which was up from a C), a B (in math), a C in an *honors* class (social studies), and a D (in language arts). (Tr. 10-11; 57). The ALJ further noted that, during a recent classroom observation, D.B. was on task 91% of the time, which exceeded the normal expectation of 80%. (Tr. 58-59). These facts, in addition to others cited by the ALJ in his decision (*e.g.*, Tr. 55-59), provide substantial evidence for the ALJ's determination.[5]

---

[5] Plaintiff also argues that D.B.'s performance on a March 2010 standardized test, on which she scored at the third grade level (despite the fact that she was in sixth grade), provides objective

18

**III.     CONCLUSION**

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be GRANTED, D.B.'s Motion for Summary Judgment [10] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: February 14, 2013                    s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

**NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991);

---

evidence of a marked limitation in the two domains at issue. (Doc. #10 at 18-20). In support of this argument, Plaintiff cites to a regulation that provides that a marked limitation is "the equivalent of the functioning we would expect to find on standardizing testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. 416.926a(e)(2). As the Commissioner persuasively points out, however, in asserting (without support) that D.B.'s test results are "clearly more than two standard deviations" below the mean (Doc. #10 at 19), Plaintiff conflates grade-level performance and standard deviation. (Doc. #14 at 10-11). The percentage of a group that scores two or more standard deviations below the mean in normally distributed data (which is the sort of data expected on a standardized test) represents only 2.3% of the population. *See Johnson v. Astrue*, 563 F. Supp. 2d 444, 458 (S.D.N.Y. 2008). Here, where there is no indication that D.B. performed at the bottom 2.3% of her peers on this – or any other – test, Plaintiff's argument that her test results were more than two standard deviations below the mean is factually unsupported. Moreover, as noted above, *supra* at 7, D.B.'s standardized test scores ranged between the 10th and the 23rd percentile, many multiples higher than scores which are two standard deviations from the mean.

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 14, 2013.

                                                s/Felicia M. Moses
                                                FELICIA M. MOSES
                                                Case Manager